# Exhibit A

# Part 1

FILED
10/5/2021 11:50 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

15079882

IN THE CIRCUIT COURT OF COOK COUNTY
STATE OF ILLINOIS

INDEPENDENT SERVICE PROVIDER LLC;        )
INTERSTATE SERVICE                        )
PROVIDER, INC.; and                       )
C PEPPER LOGISTICS LLC                    )
                                          )
         Plaintiffs,                      )        Cause No.:    2021L009787
                                          )
v.                                        )        Div.
                                          )
MIGUEL AGUIRRE                            )
Serve: ████████████████████              )
       Chicago, IL 60623                  )
                                          )
MICHAEL ALBERT                            )
Serve: ████████████                       )
       Belleville, IL 62221               )
                                          )
VERNON ARMSTRONG                          )
Serve: ██████████████                     )
       Flossmoor, IL 60422                )
                                          )
HUMBERTO BANDA                            )
Serve: ██████████████                     )
       Plainfield, IL 60586               )
                                          )
TIMOTHY BRANCH                            )
Serve: ████████████████                   )
       Markham, IL 60428                  )
                                          )
RICARDO CARRERA                           )
Serve: ██████████████████                 )
       Hillside, IL 60162                 )
                                          )
CBL TRUCKING, LLC                         )
Serve: c/o LegalInc Corporate Services Inc. )
       200 E. Randolph St., Suite 5100    )
       Chicago, IL 60601                  )
                                          )
EDWARD CLARK                              )
Serve: ██████████████                     )
       Bolingbrook, IL 60440              )
                                          )
TAMMY COFFMAN                             )

FILED DATE: 10/5/2021 11:50 AM  2021L009787

FILED DATE: 10/5/2021 11:50 AM   2021L009787

Serve: ███████████                                         )
      Mount Vernon, IL 62864                              )
                                                         )
TONY COFFMAN                                               )
Serve: ███████████                                         )
      Mount Vernon, IL 62864                              )
                                                         )
CP DELIVERY, LLC                                           )
Serve:  c/o Illinois Corporation Service Co.               )
      801 Adlai Stevenson Drive                           )
      Springfield, IL 62703                               )
                                                         )
THOMAS CULLICK                                             )
Serve: ███████████                                         )
      Joliet, IL 60435                                   )
                                                         )
EUGENE CYTRYCH                                             )
Serve: ███████████                                         )
      Plainfield, IL 60544                               )
                                                         )
EDGAR DAMIAN-CEBALLOS                                      )
Serve: ███████████                                         )
      Warrenville, IL 60555                              )
                                                         )
JAMES DECKER                                               )
Serve: ███████████                                         )
      Clinton, IL 61727                                  )
                                                         )
KEVIN DOUGHERTY                                            )
Serve: ███████████                                         )
      Rockdale, IL 60436                                 )
                                                         )
JAMES DRISH                                                )
Serve: ███████████                                         )
      Chicago, IL 60655                                  )
                                                         )
JEREMY DROWNS                                              )
Serve: ███████████                                         )
      Colona, IL 61241                                   )
                                                         )
HAYES FARMER, JR.                                          )
Serve: ███████████                                         )
      Joliet, IL 60435                                   )
                                                         )
SHAWN FLYNN                                                )
Serve: ███████████                                         )

2



Moline, IL 61265

JUAN GONZALEZ
Serve: ██████████
Yorkville, IL 60560

TUAN HUYNH
Serve: ████████████
Chicago, IL 60645

STANLEY JOHNSON
Serve: ████████████
Posen, IL 60469

FATON JUSUFI
Serve: ██████████
Oswego, IL 60543

JASON KOHN
Serve: ████████
Chicago Heights, IL 60411

WILLIAM M. LAWSON
Serve: ████████
Moline, IL 61265

JAVIER LEON
Serve: ████████████
Plainfield, IL 60586

JOE LOWRY
Serve: ████████
Bloomington, IL 61701

JUAN MACOTELLO
Serve: ██████████████
Chicago, IL 60642

CHRIS MCMILLAN
Serve: ██████████
Hartsburg, IL 62643

DAVID MESICK
Serve: ████████████
Peoria, IL 61615

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

3



ANDRE MOORE
Serve: ███████████████
  Chicago, IL 60621

JAMES MOORE
Serve: ███████████████
  Chicago, IL 60643

ROBERT MURPHY
Serve: ███████████
  East Moline, IL 61244

JASON REDELL
Serve: ███████████
  Moline, IL 61265

CLARE REULAND
Serve: ████████████
  Ottawa, IL 61350

CHRISTIAN REYES
Serve: ███████████████
  Chicago, IL 60629

CHASE ROMAN
Serve: █████████
  Aurora, IL 60504

JOSE ROSAS
Serve: ██████████
  Ottawa, IL 61350

MICHAEL ROSS
Serve: ███████████
  Joliet, IL 60433

MITCHELL ROTONDO
Serve: ███████████████
  Chicago, IL 60631

TIMOTHY SIMS
Serve: ██████████
  Pontiac, IL 61764

MARCUS SLAUGHTER
Serve: ███████████████

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FILED DATE: 10/5/2021 11:50 AM 2021L009787

4



Peoria, IL 61614 )
)
NAPOLEAN STUCKY )
Serve: ██████████ )
Peoria, IL 61605 )
)
PAUL SWINFORD )
Serve: ████████ )
Geneseo, IL 61254 )
)
DAVID TAYLOR )
Serve: ████████ )
Custer Park, IL 60481 )
)
LARRY THOMAS )
Serve: ██████████████ )
Joliet, IL 60433 )
)
TITANIUM DISTRIBUTION, LLC )
Serve: c/o Adrian Smith )
       1 Westbrook Corporate Center, Ste. 300 )
       Westchester, IL 60154 )
)
MARCELLUS WARREN )
Serve: ██████████ )
Decatur, IL 62522 )
)
VAN WELLS II )
Serve: ████████ )
Calumet City, IL 60409 )
)
and )
)
ANTONIO ZARAGOZA )
Serve: █████████ )
Minooka, IL 60447 )
)
Defendants. )

FILED DATE: 10/5/2021 11:50 AM   2021L009787

## **COMPLAINT**

COMES NOW, the Plaintiffs, INDEPENDENT SERVICE PROVIDER LLC, INTERSTATE SERVICE PROVIDER, INC., and C PEPPER LOGISTICS LLC by and through the undersigned counsel, and for their Complaint against MIGUEL AGUIRRE, MICHAEL

5

FILED DATE: 10/5/2021 11:50 AM  2021L009787

ALBERT, VERNON ARMSTRONG, HUMBERTO BANDA, TIMOTHY BRANCH, RICARDO CARRERA, CBL TRUCKING, LLC, EDWARD CLARK, TAMMY COFFMAN, TONY COFFMAN, CP DELIVERY, LLC, THOMAS CULLICK, EUGENE CYTRYCH, EDGAR DAMIAN-CEBALLOS, JAMES DECKER, KEVIN DOUGHERTY, JAMES DRISH, JEREMY DROWNS, HAYES FARMER, JR., SHAWN FLYNN, JUAN GONZALEZ, TUAN HUYNH, STANLEY JOHNSON, FATON JUSUFI, JASON KOHN, WILLIAM M. LAWSON, JAVIER LEON, JOE LOWRY, JUAN MACOTELLO, CHRIS MCMILLAN, DAVID MESICK, JAMES MOORE, ANDRE MOORE, ROBERT MURPHY, JASON REDELL, CLARE REULAND, CHRISTIAN REYES, CHASE ROMAN, JOSE ROSAS, MICHAEL ROSS, MITCHELL ROTONDO, TIMOTHY SIMS, MARCUS SLAUGHTER, NAPOLEON STUCKY, PAUL SWINFORD, DAVID TAYLOR, LARRY THOMAS, TITANIUM DISTRUBUTION, MARCELLUS WARREN, VAN WELLS II, and ANTONIO ZARAGOZA do hereby state:

## JURISDICTION AND VENUE

1.      This is an action for money damages in excess of thirty thousand dollars ($30,000.00) within the jurisdiction of the Circuit Court.

2.      Venue is proper in this Court pursuant to 735 ILCS 5/2-101, in that the transaction and events giving rise to the causes of action set forth herein took place in this County.

3.      Plaintiff INDEPENDENT SERVICE PROVIDER LLC is a limited liability company that maintains a registered agent in the State of Illinois and that does business in Illinois.

4.      Plaintiff INTERSTATE SERVICE PROVIDER, LLC is a corporation that maintains a registered agent in the State of Illinois and that does business in Illinois.

5.      Plaintiff C PEPPER LOGISTICS LLC is a limited liability company that maintains a registered agent in the State of Illinois and that does business in Illinois.

6

FILED DATE: 10/5/2021 11:50 AM   2021L009787

6.  Plaintiffs' main office, which is located in the warehouse where drivers get their trucks and talk to managers, is in this jurisdiction.

7.  The misappropriation of assets, confidential and proprietary information, and equipment as alleged herein occurred in this County.

8.  The Defendant, MIGUEL AGUIRRE, is a driver residing in Cook County, Illinois, doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

9.  The Defendant, MICHAEL ALBERT, is a driver residing in St. Clair County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

10.  The Defendant, VERNON ARMSTRONG, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

11.  The Defendant, HUMBERTO BANDA, is a driver residing in Will County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

12.  The Defendant, TIMOTHY BRANCH, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

13.  The Defendant, RICARDO CARRERA, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

14.  The Defendant, CBL TRUCKING, LLC, is a limited liability company located in

7

FILED DATE: 10/5/2021 11:50 AM    2021L009787

Kane County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

15.    The Defendant, EDWARD CLARK, is a driver residing in Will County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

16.    The Defendant, TAMMY COFFMAN, is a driver residing in Jefferson County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

17.    The Defendant, TONY COFFMAN, is a driver residing in Jefferson County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

18.    The Defendant, CP DELIVERY, LLC, is a limited liability company located in Will County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

19.    The Defendant, THOMAS CULLICK, is a driver residing in Will County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

20.    The Defendant, EUGENE CYTRYCH, is a driver residing in Will County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

21.    The Defendant, EDGAR DAMIAN-CEBALLOS, is a driver residing in DuPage County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

FILED DATE: 10/5/2021 11:50 AM    2021L009787

22.     The Defendant, JAMES DECKER, is a driver residing in DeWitt County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

23.     The Defendant, KEVIN DOUGHERTY, is a driver residing in Will County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

24.     The Defendant, JAMES DRISH, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

25.     The Defendant, JEREMY DROWNS, is a driver residing in Washington County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

26.     The Defendant, HAYES FARMER, JR., is a driver residing in Will County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

27.     The Defendant, SHAWN FLYNN, is a driver residing in Rock Island County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

28.     The Defendant, JUAN GONZALEZ, is a driver residing in Kendall County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

29.     The Defendant, TUAN HUYNH, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this

jurisdiction.

30.     The Defendant, STANLEY JOHNSON, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

31.     The Defendant, FATON JUSUFI, is a driver residing in Kendall County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

32.     The Defendant, JASON KOHN, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

33.     The Defendant, WILLIAM M. LAWSON, is a driver residing in Rock Island County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

34.     The Defendant, JAVIER LEON, is a driver residing in Will County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

35.     The Defendant, JOE LOWRY, is a driver residing in McLean County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

36.     The Defendant, JUAN MACOTELLO, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

37.     The Defendant, CHRIS MCMILLAN, is a driver residing in Logan County, Illinois

FILED DATE: 10/5/2021 11:50 AM   2021L009787

10

FILED DATE: 10/5/2021 11:50 AM    2021L009787

and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

38.     The Defendant, DAVID MESICK, is a driver residing in Peoria County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

39.     The Defendant, ANDRE MOORE, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

40.     The Defendant, JAMES MOORE, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

41.     The Defendant, ROBERT MURPHY, is a driver residing in Rock Island County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

42.     The Defendant, JASON REDELL, is a driver residing in Rock Island County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

43.     The Defendant, CLARE REULAND, is a driver residing in LaSalle County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

44.     The Defendant, CHRISTIAN REYES, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

11

FILED DATE: 10/5/2021 11:50 AM   2021L009787

45.     The Defendant, CHASE ROMAN, is a driver residing in DuPage County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

46.     The Defendant, JOSE ROSAS, is a driver residing in LaSalle County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

47.     The Defendant, MICHAEL ROSS, is a driver residing in Will County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

48.     The Defendant, MITCHELL ROTONDO, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

49.     The Defendant, TIMOTHY SIMS, is a driver residing in Livingston County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

50.     The Defendant, MARCUS SLAUGHTER, is a driver residing in Peoria County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

51.     The Defendant, NAPOLEON STUCKY, is a driver residing in Peoria County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

52.     The Defendant, PAUL SWINFORD, is a driver residing in Henry County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in

FILED DATE: 10/5/2021 11:50 AM 2021L009787

this jurisdiction.

53.     The Defendant, DAVID TAYLOR, is a driver residing in Will County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

54.     The Defendant, LARRY THOMAS, is a driver residing in Will County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

55.     The Defendant, TITANIUM DISTRUBUTION, LLC, is a limited liability company located in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

56.     The Defendant, MARCELLUS WARREN, is a driver residing in Macon County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

57.     The Defendant, VAN WELLS II, is a driver residing in Cook County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

58.     The Defendant, ANTONIO ZARAGOZA, is a driver residing in Kendall County, Illinois and doing business in the State of Illinois, and who engaged in the acts complained of herein in this jurisdiction.

## GENERAL ALLEGATIONS

59.     Plaintiffs are logistics companies, authorized motor carriers, and have independent drivers working for them.  This Complaint alleges breach of contract and seeks injunctive relief and liquidated damages provided for in the contracts with Defendants.

13

FILED DATE: 10/5/2021 11:50 AM    2021L009787

60.    There is related litigation in Federal Court in Missouri, (The United States District Court for the Eastern District of Missouri, No.: 4:20-cv-01444-MTS) involving individual nonparties Steve Lanter and James Pepper. Steve Lanter operates a national logistics company called Lanter Delivery Systems. James Pepper, through multiple entities" ("Pepper") worked with Lanter Delivery Systems, with the entities entering into contracts with drivers who worked as independent contractors.

61.    In the Missouri case, Pepper alleges Steve Lanter conspired with White Line Systems, LLC to improperly coerce the drivers with whom it contracted to leave Pepper and join White Line Systems. All the drivers did leave Pepper, breached their contracts, and are now working for White Line Systems, LLC.

62.    Each driver (600+ in various states, including Defendants herein), breached his/her respective contract by leaving Plaintiffs to drive for the same competitor motor carrier: White Line Systems, LLC. The drivers were intentionally misinformed by Steve Lanter and White Line Systems, LLC and given no option but to immediately begin working for White Line Systems, LLC.

63.    All drivers continue to drive the same routes they drove for Pepper for the exact same clients for White Line Systems LLC.

64.    The drivers are using Plaintiffs' trade secrets, including without limitation, Plaintiffs' routes, customer lists, and billing procedures, and in some cases, Plaintiffs' unique DOT identification numbers.

65.    Plaintiffs entered into an independent contractor agreement with each driver, attached as Exhibit A.

66.    The contracts do not include noncompete clauses (drivers are allowed to drive for

14

FILED DATE: 10/5/2021 11:50 AM   2021L009787

other motor carriers) but include non-solicitation and confidentiality provisions that have been breached and that are the subject of a claim for injunctive relief.

67.     The contracts further provide that in addition to other legal or equitable remedies, Plaintiffs may seek and obtain immediate injunctive relief in the form of a temporary restraining order without notice …. and without posting any bond… and shall not be required to demonstrate any actual injury or damage.

68.     The contracts require ten (10) business days' notice by a driver to terminate the contract.

69.     No drivers provided a ten-day notice of termination.

70.     The drivers simply left their driving obligations with Plaintiffs to join a competitor who lured them away with promises, lies, and money.

71.     The drivers are directly using the confidential information and Plaintiffs' trade secrets and are in breach of their respective contracts.

72.     The Plaintiffs have a clear likelihood of success on the merits due to the multiple breaches described herein.

## COUNT I: BREACH OF CONTRACT AS TO THE DEFENDANTS

COME NOW Plaintiffs, by and through their undersigned counsel, and for Count I of their Complaint for Breach of Contract, do hereby state:

73.     Plaintiffs incorporate by reference paragraphs 1-72, as if fully set forth herein.

74.     The parties entered into enforceable contracts; the independent contractor agreement, attached "A".

75.     Plaintiffs performed all parts of the contracts to be performed by it.

76.     Defendants breached their respective contracts in multiple ways, including *inter*

*alia* by refusing to drive for Plaintiffs during the term of their Agreements, diverting the equipment to the benefit of another while Plaintiffs had the exclusive right to the equipment for the conduct of its business, and using confidential and proprietary information and materials for the benefit of another without Plaintiffs' consent.

77. Defendants breached their non-solicitation and confidentiality obligations by using Plaintiffs' customer lists, routes, clients, trade secrets, procedure manuals etc. and DOT identification numbers.

78. As a direct result of the aforesaid conduct and breach of the Defendants, the Plaintiffs sustained injuries, losses, and said damages continue to accrue.

WHEREFORE, the Plaintiffs hereby respectfully request a judgment in excess of $30,000.00, together with costs and attorneys' fees incurred herein, and for such other and further relief this Honorable Court deems appropriate.

## COUNT II: INJUNCTIVE RELIEF AS TO THE DEFENDANTS

COMES NOW Plaintiffs, by and through their undersigned counsel, and for Count II of their Complaint for Injunctive Relief as to the Defendants, do hereby state:

79. The Plaintiffs reallege and incorporate paragraphs 1 through 78 as if fully set forth herein.

80. The standard criteria for issuance of an injunction in the context of the facts of this case are:

a. Irreparable harm absent entry of injunctive relief- Defendants' breaches are causing direct financial damage other non-economic damages;

b. Plaintiffs have a very strong likelihood of success on the merits because the objective and indisputable facts clearly demonstrate that the Defendants have not complied

FILED DATE: 10/5/2021 11:50 AM   2021L009787

FILED DATE: 10/5/2021 11:50 AM   2021L009787

with the most fundamental obligations placed upon them in their contract;

     c.     The threatened harm to Plaintiffs outweighs any possible harm to the Defendants, who will not suffer harm because they can simply drive for the Plaintiffs. Denial of injunctive relief would result in substantial harm to the Plaintiffs; and

     d.     Entry of an injunction will discourage covert and secretive attempts to deprive innocent parties of their beneficial interest in agreements.

<u>IRREPARABLE HARM</u>

81.     Plaintiffs had drivers, routes, and clients all stolen in one day by White Line Systems, LLC.  Defendants/drivers all left in one day and are now driving the exact same routes for the exact same clients, causing immediate and continuing damage.

82.     All drivers, including Defendants, took Plaintiffs' trade secrets and confidential information, unique DOT identification, routes, clients, procedure manuals, and bills of lading and continue to use them.

<u>LIKELIHOOD OF SUCCESS ON THE MERITS</u>

83.     There are numerous breaches of the Agreements.

84.     The Independent Contractor Agreement provides:

"Contractor (driver) agrees to abide by all DOT laws. The drivers continued to use the USDOT number of the Plaintiffs while driving for White Line Systems, LLC."

Exhibit "A" the Independent Contractor contract.  Page three, number 8

85.     After the drivers moved to White Line, they continued to use Plaintiffs' DOT numbers.

86.     The Defendant drivers continued use of Plaintiffs' driver logs, bills of lading, waybills, freight bills, and manifests was a violation of Department of Transportation regulations.

FILED DATE: 10/5/2021 11:50 AM 2021L009787

87.     The Contracts further provide:

"Notwithstanding anything to the contrary in this agreement, This Agreement may be terminated, at any time, by either party in the event of a party's' actual or threatened commitment of a felony or any intentional tort violation of, or failure to comply fully with, the requirements of any applicable federal, state, local and foreign authorities, including but not limited to DOT, state, provincial or local highway safety, vehicle inspections… truck weight, hazardous materials…"

88.     As a result of Defendants' acts, Plaintiffs had no way of checking for hazardous materials or traffic violations and accidents endangering the citizens of this County and State.

89.     Paragraph 20 of the Agreement provides:

"20.     CONFIDENTIALITY AND NON-SOLICITATION. CONTRACTOR hereby recognizes and acknowledges that any list of CARRIER's customers, as it may exist now or from time to time, is a valuable, special and unique asset of the business of CARRIER. CONTRACTOR agrees, during and after the term of this Agreement, not to disclose the list of CARRIER's customers or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever without CARRIER's prior written consent. CONTRACTOR agrees to preserve as "Confidential Matters", all trade secrets, know-how and information relating to CARRIER's business, forms, processes, developments, sales and promotional systems, prices and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, or other contractors, and other sources of any kind resulting from this Agreement. CONTRACTOR agrees to regard such Confidential Matters as the sole property of CARRIER, and shall not publish, disclose or disseminate the same to others In the event of any breach or threatened breach by CONTRACTOR of the provisions of this paragraph, CARRIER shall be entitled to an injunction, restraining CONTRACTOR from disclosing, in whole or in part, the list of CARRIER's customers, and all other Confidential Matters. CONTRACTOR agrees that CARRIER will be irreparably damaged in the event of any breach of this provision by CONTRACTOR. Accordingly, in addition to any other legal or equitable remedies that may be available to CARRIER, CONTRACTOR agrees that CARRIER will be able to seek and obtain immediate injunctive relief in the form of a temporary restraining order without notice, preliminary injunction, or permanent injunction against CONTRACTOR to enforce this confidentiality provision. CARRIER shall not be required to post any bond or other security and shall not be required to demonstrate any actual injury or damage to obtain injunctive relief from the courts. Nothing hereunder shall be construed as prohibiting CARRIER from pursuing any remedies available to CARRIER at law or in equity for such breach, including the recovery of monetary damages from CONTRACTOR. will not solicit traffic from any shipper, consigner, consignee or customer of CARRIER where (1) the availability of such traffic first became known

18

FILED DATE: 10/5/2021 11:50 AM 2021L009787

to CARRIER as a result of CARRIER efforts, or (2) the traffic of the shipper, consignee, consignee or customer of CARRIER was first tendered to the CARRIER by CARRIER. If CARRIER breaches this contract and directly or indirectly delivers or solicits traffic from customers of ISP and obtains traffic from such customers during the term of this contract of twenty-four (24) months thereafter, as a result of adverse routing impact arising from loss of business by virtue of violation of this provision, CARRIER shall be obligated to pay CARRIER, for a period of fifteen (15) months thereafter, as liquidated damages and not as a penalty, the amount equal to seventy-five percent (75%) of the transportation revenue resulting from traffic transported for such customers, and CARRIER will provide CARRIER with all documentation requested by CARRIER to verify such transportation revenue."

90.     The foregoing provision was breached in the following material ways:

  a.     Defendants gave customer information to White Line Systems and are still using the information while driving for White Line covering the same routes from the same warehouse.

  b.     Defendants were using Plaintiffs' business forms, systems and procedures, books, records and sources and delivered it to white Line Systems for its use without Plaintiffs' written consent.

91.     Plaintiffs have been made aware that their DOT numbers got traffic violations and at least one accident with incorrect identification numbers.

92.     Drivers were driving with no pre-employment drug tests:

93.     Plaintiffs are seeking to enjoin the Defendants from driving the exact same routes, from the exact same warehouse to the exact same clients using Plaintiffs' customer list and other confidential information. The drivers are free to drive for anyone else.

94.     The financial hardship to Plaintiffs and possible danger to the community far exceeds the minimal hardship to the Defendants, who have significant opportunity to drive for others.

95.     Plaintiffs have no adequate remedy at law, as damages are inadequate to account for lost business relationships and future growth potential.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter its Order

granting a temporary injunction to enjoin defendants from breaching the non-solicitation and confidentiality provisions of their agreements, including without limitation, by driving for Plaintiffs' customers and providing customer and route information to a third party, for their costs and attorneys' fees incurred herein, and such other and further relief as this Court deems just and proper under the circumstances.

Respectfully submitted,

HEIN SCHNEIDER & BOND P.C.

*/s/ Jill R. Rembusch*
Jill R. Rembusch, #46251
John Hein, #53182
Grant J. Mabie, #61095
2244 S. Brentwood Blvd.
St. Louis, Missouri 63144
Telephone:     (314) 863-9100
Facsimile:      (314) 863-9101
Email: jrr@hsbattorneys.com
            jjh@hsbattorneys.com
            gjm@hsbattorneys.com
***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2021, the foregoing document was filed electronically with the Clerk of the Court and served by operation of the Court's electronic filing system upon all counsel of record participating in this case by Electronic Case Filing. Additionally, a copy of the foregoing document was served on the following parties by email:

*/s/ Jill R. Rembusch*

20

FILED
10/5/2021 1:29 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L009787

**INDEPENDENT CONTRACTOR AGREEMENT**

Interstate Service Providers       ("CARRIER"), an authorized motor carrier, and
Marcellus Warren       ("CONTRACTOR"), in consideration of the covenants and
agreements contained herein and pursuant to the federal leasing regulations under 49 C.F.R. Part 376,
enter into this Independent Contractor Agreement ("Agreement") on May       21st, 20 20 .

1. **PROVISION OF SERVICES AND EQUIPMENT.** During the term of this Agreement,
CONTRACTOR shall provide CARRIER professional truck driving services, other incidental transportation
related services, and the use of the equipment set forth below or in an appendix (the "Equipment").
CONTRACTOR represents and warrants that CONTRACTOR has title to or is authorized to contract the
Equipment and services to CARRIER. Upon taking possession of the Equipment from CONTRACTOR,
CARRIER shall furnish to CONTRACTOR a receipt for Equipment, which shall constitute the receipt
required by 49 C.F.R. § 376.11(b). Upon termination of this Agreement, CONTRACTOR shall execute a
similar receipt for equipment as the written receipt for the return of the Equipment by CARRIER to
CONTRACTOR; provided, however, that the Agreement and CARRIER's obligations thereunder shall
expire upon the written notice of termination regardless of whether CONTRACTOR submits the receipt
required under this provision.

| Year | Make | Serial No. | Unit # |
|------|------|-----------|--------|
| 2018 | INTL | 1HTMMMML3GH208275 | 647128 |
| | | | |
| | | | |

2. **DURATION OF AGREEMENT AND TERMINATION.** This Agreement shall begin on the date set
forth above and end exactly one (1) year thereafter. Either party may terminate this Agreement for any
reason by giving ten (10) business days (excluding weekends and federal holidays) written notice to that
effect to the other party either personally, by mail, by fax machine at the address or fax number shown at
the end of this Agreement. CARRIER may terminate this Agreement without the full ten (10) business
days prior written notice if CONTRACTOR abandons its responsibility for providing services under this
Agreement or if the customers serviced by CONTRACTOR voices complaints about the failure of
CONTRACTOR or its employees to meet customer requirements, or if CARRIER loses any such
customer on the account of CONTRACTOR. In the event CARRIER is required to terminate the
Agreement under this provision, CONTRACTOR shall be liable for payment equal to the average daily
compensation set forth in Section 3 below multiplied by the number of days short of ten (10) days for
which the wrongdoing CONTRACTOR failed to give notice of ceasing its responsibility. CARRIER may
deduct any such sum from any final amounts owed to CONTRACTOR under this Agreement. The ability
of either party to terminate this Agreement shall in no way be interpreted as an at-will employment
provision and shall not otherwise affect CONTRACTOR's status as an independent contractor under this
Agreement. The effective date and time of termination shall be as set forth in the written notice or the
receipt for Equipment issued by CONTRACTOR, whichever date is earlier. CONTRACTOR shall, upon
the termination of this Agreement, remove all CARRIER identification from the Equipment and return it to
CARRIER, via hand delivery or certified mail, together with all of CARRIER's property, including trailers,
paperwork, load securement equipment and freight, to CARRIER's nearest terminal. If CONTRACTOR
fails to return CARRIER's property or freight to CARRIER or remove and return all CARRIER
identification from the Equipment upon termination of this Agreement, CONTRACTOR shall pay
CARRIER, all collections costs incurred by CARRIER, including reasonable attorney fees, and CARRIER
may pursue all other remedies allowed by law or authorized in the Agreement against CONTRACTOR.

3. **COMPENSATION.** It is expressly understood and agreed that CONTRACTOR's compensation
shall be as set forth in Appendix A, and such compensation shall constitute the total compensation for
everything furnished, provided, or done by CONTRACTOR in connection with this Agreement, including
driver's services. All mileage computations shall be based on the most recent edition of CARRIER's
Mileage Guide. Although CARRIER shall use reasonable efforts to make shipments available to

FILED DATE: 10/5/2021 1:29 PM   2021L009787

FILED DATE: 10/5/2021 1:29 PM   2021L009787

CONTRACTOR for transportation during the term of this Agreement, CONTRACTOR acknowledges and agrees that CARRIER does not guarantee any specific number of shipments or amount of revenue to CONTRACTOR during the term of this Agreement.  CONTRACTOR may refuse any specific shipment offered by CARRIER.  CONTRACTOR is not prohibited from entering into separate agreements to provide equipment and other professional truck drivers not identified as Equipment above or in an attachment and drivers not used to service this Agreement, to other motor carriers.

4.      **SETTLEMENT PERIOD.**   CARRIER shall settle with CONTRACTOR with respect to services provided under this Agreement within 15 calendar days after CONTRACTOR's submission, in proper form, of those documents necessary for CARRIER to secure payment from its customers, including the signed freight bill, delivery receipt or bill of lading, and properly completed logs as required by the U.S. Department of Transportation ("DOT"). Where CONTRACTOR is paid a percentage of revenue, CARRIER will provide CONTRACTOR with a copy of the rated freight bill (or a computed-generated summary) before or at the time of settlement.  CONTRACTOR may examine CARRIER's tariffs, or other contracts or documents, if any, from which charges and rates are computed; provided, however, only that information that would appear on a rated freight bill will be disclosed by CARRIER.  CARRIER shall have the right, but not as a condition of settlement and payment, to review all of CONTRACTOR's documents and records relating to the use of the Equipment and the services provided under this Agreement and CONTRACTOR agrees to provide CARRIER with access to such documents and records upon reasonable notice. With respect to final settlement upon termination of this Agreement, the failure on the part of CONTRACTOR to remove and return to CARRIER all identification devices of CARRIER or a letter certifying their removal shall entitle CARRIER to withhold any payments owed to CONTRACTOR until such obligation is met.

5.      **CHARGE BACK.**   CARRIER shall deduct from CONTRACTOR's compensation, at the time of payment to or settlement with CONTRACTOR, any liability or expense CARRIER has incurred or paid that, under this Agreement or any addendum to this Agreement, CONTRACTOR is obligated to bear.  Such expenses shall be deducted from the amount of CONTRACTOR's settlement compensation and shall include those expenses set forth in Appendix A of this Agreement.   The amount of each item to be charged back to CONTRACTOR shall be computed based on the actual cost or expense incurred by CARRIER and any administrative fee or mark-up disclosed in Appendix A or elsewhere in this Agreement or any addendum thereto.  CARRIER shall provide CONTRACTOR written itemization and documentation of all charge backs where such documentation is necessary to verify the validity of the charge.

6.      **INSURANCE.**   The respective obligations of the parties shall be as set forth in Appendix B. CARRIER shall maintain public liability, property damage and cargo insurance in such amounts as are required by the DOT and applicable state regulatory agencies.  CARRIER shall maintain insurance coverage for the protection of the public pursuant to 49 U.S.C. § 13906.  CARRIER's possession of legally required insurance shall in no way restrict CARRIER's right of indemnification from CONTRACTOR as provided under this Agreement.  It shall be considered a material breach of this Agreement where CONTRACTOR is determined by CARRIER or CARRIER's insurer to be uninsurable for any reason.

7.      **ESCROW FUND.**        CONTRACTOR authorizes CARRIER to establish and administer an escrow fund in accordance with the provisions of Appendix C.

FILED DATE: 10/5/2021 1:29 PM    2021L009787

**8.     COMPLIANCE WITH PERTINENT LAWS AND REGULATIONS BY CONTRACTOR.** CONTRACTOR recognizes that CARRIER's separate and distinct business of providing motor carrier freight transportation service to the public is subject to regulation by the federal government acting through the DOT, and by various other federal, state, local, and foreign governing bodies.  As such, CONTRACTOR hereby acknowledges that he/she possesses full and complete understanding and knowledge of the DOT's CSA program (including, but not necessarily limited to, driver violations and ranking criteria).  CONTRACTOR shall adhere to the following provisions of this Agreement to aid CARRIER in discharging its legal duties:

(a)     **Drivers.**   CONTRACTOR shall provide competent professional drivers who meet CARRIER's minimum driver qualification standards and all of the requirements of the DOT, including but not limited to, familiarity and compliance with state and federal motor carrier safety laws and regulations. The parties agree that CARRIER shall have the right to disqualify any driver provided by CONTRACTOR in the event that the driver is found to be unsafe, unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law or the criteria established by the DOT's Compliance, Safety & Accountability ("CSA") program, in violation of CARRIER's minimum qualification standards, or in violation of any policies of CARRIER's customers.  Drivers with a recent history of accidents, traffic convictions and/or serious traffic offenses will not meet CARRIER's minimum qualification standards.   Upon a driver's disqualification by CARRIER, CONTRACTOR shall be obligated to furnish another competent, reliable and qualified professional driver that meets the minimum qualification standards established by CARRIER.  For all qualified drivers, CONTRACTOR agrees to provide CARRIER with updated DSMS and DIRS driver rankings on a monthly basis.

(b)     **Paperwork Requirements.**   CONTRACTOR shall submit to CARRIER, on a timely basis, all driver logs and supporting documents (including original toll receipts for CARRIER's reproduction), physical examination certificates, accident reports, and any other required data, documents or reports, including any documentary evidence that CARRIER requests proving CONTRACTOR has paid all taxes legally due and owing to any government body.  As required by 49 C.F.R. § 376.12(l), CARRIER will keep the original of this Agreement with a copy to be maintained by CONTRACTOR, and a second copy to be carried in the Equipment during the term of this Agreement.

(c)     **Shipping Documents.**   CONTRACTOR agrees that all bills of lading, waybills, freight bills, manifests, or other papers identifying the property carried on the Equipment shall be those of CARRIER, or as authorized by CARRIER, and shall indicate that the property transported is under the responsibility of CARRIER or a carrier with which the Equipment has been subcontracted.

(d)     **Drug and Alcohol Testing.**  CONTRACTOR and its drivers shall, as required by 49 C.F.R. § 382.103, comply with CARRIER's Drug and Alcohol Policy, including participation in CARRIER's random drug and alcohol testing program, and any addendums or revisions thereto.

(e)     **Safe Operations.**   CONTRACTOR agrees to operate the Equipment in a safe and prudent manner at all times so as to avoid endangering the public, the driver, and/or the property being transported and in accordance with this Agreement, the laws of the various jurisdictions in which the Equipment will be operated and pursuant to the operating authorities of CARRIER, and in accordance with all rules related to traffic safety, highway protection and road requirements. Moreover, CONTRACTOR agrees that all drivers and/or workers employed by CONTRACTOR will comply with the terms of this Agreement, including the requirement of safe operations, while operating the Equipment on behalf of CONTRACTOR.   CONTRACTOR agrees that any driver utilized by CONTRACTOR will comply with CARRIER's policies and procedures and any subsequent revisions thereto, which will be provided by CARRIER.

FILED DATE: 10/5/2021 1:29 PM    2021L009787

**(f)** **CSA Compliance**. Beginning on the date the FMCSA makes its CSA Program effective as to CARRIER's and CONTRACTOR's operations under this Agreement, CONTRACTOR shall ensure that CONTRACTOR, and any drivers of CONTRACTOR, and CONTRACTOR's Equipment shall at all times meet CSA safety standards sufficient to enable CARRIER to (a) achieve and maintain a "fit" or similar rating that enables CARRIER to operate without FMCSA intervention or restriction pertaining to driver, equipment, and other CSA performance measures; (b) obtain insurance coverage without increased costs associated with driver, equipment, or other performance measures under CSA; and (c) be and remain competitive with similarly situated carriers with regard to safety performance measures under CSA. CONTRACTOR further agrees to notify CARRIER in writing within two (2) business days of receiving notification from the FMCSA that CONTRACTOR or any of its drivers have been deemed "unfit" or "marginal" based on their safety and compliance performance.

9. **OPERATIONAL EXPENSES.**

**(a)** **Operating Expenses**. CONTRACTOR shall, at its sole cost and expense, provide all the Equipment ready to operate and fully roadworthy, including the necessary licenses, permits, cab cards, state base plates and shall furnish all necessary oil, fuel, tires, and other parts, supplies and equipment necessary or required for the safe and efficient operation and maintenance of the Equipment, including repairs for the operation of such Equipment. CONTRACTOR shall pay all expenses incident to the operation of the Equipment, including, but not limited to, empty mileage, lumper expenses, highway use taxes, weight taxes, state property or indefinite situs taxes, fuel taxes, registration fees, ferry and toll charges, and detention and accessorial charges not collected by CARRIER because of CONTRACTOR's failure to provide the required documentation.

**(b)** **Maintenance and Inspection**. CONTRACTOR, at its sole cost and expense, shall maintain the Equipment in safe condition and in complete compliance with all laws and regulations of the states in which CONTRACTOR operates and the DOT. In order to ensure compliance with all DOT regulations, CONTRACTOR shall, at its sole cost and expense, make the Equipment available for inspection by CARRIER upon reasonable request by CARRIER. CONTRACTOR shall, at its sole cost and expense, have the Equipment inspected annually, as required by 49 C.F.R. § 396.17, at CARRIER's maintenance facility or at another maintenance facility which CARRIER may, in its sole discretion, authorize. CONTRACTOR shall, as directed by CARRIER, forward to CARRIER all inspection, maintenance and repair records for the Equipment.

**(c)** **Fines**. CONTRACTOR or its drivers (as professional drivers engaged in a separate and distinct profession) agree to pay all fines, including but not limited to parking and traffic fines and penalties, imposed for violation of any law or regulation by the state or any locality in which CONTRACTOR operates, or the DOT, where such violation results, at least partially, from the acts or omissions of CONTRACTOR.

**(d)** **Overweight and Oversized Shipments**. CONTRACTOR or CONTRACTOR's drivers (as professional drivers engaged in a separate and distinct profession) shall have the duty to determine that all shipments are in compliance with the size and weight laws of the states in which or through which the Equipment will travel and to notify CARRIER if the vehicle is overweight, oversized or in need of permits before commencing the haul. Except when the violation results from the acts or omissions of CONTRACTOR, CARRIER shall assume the risks and costs of fines for overweight and oversize trailers when such trailers are preloaded and sealed, or the load is containerized, or for improperly permitted oversized and overweight loads, or the trailer or lading is otherwise outside of CONTRACTOR's control. CONTRACTOR shall pay, or reimburse CARRIER, for any costs or penalties due to CONTRACTOR's failure to weigh each shipment or to notify CARRIER that the vehicle is overweight, oversized or in need of permits.

4

FILED DATE: 10/5/2021 1:29 PM    2021L009787

**(e)** **License Plates**.  Upon request by CONTRACTOR, CARRIER may, but is not required to, obtain either a state base plate or a base plate under the International Registration Plan ("IRP") in CARRIER's name for use by CONTRACTOR, the cost of which shall be deducted from CONTRACTOR's compensation.  CONTRACTOR shall remove and return any IRP plate to CARRIER upon the termination of this Agreement and, in the event CONTRACTOR fails or refuses to do so, CARRIER shall, and is hereby authorized to, deduct the full cost of the plate from CONTRACTOR's final settlement and escrow funds.  If CARRIER receives a refund or credit for an IRP plate registered in the name of CARRIER or such base plate is authorized by CONTRACTOR to be resold by CARRIER to another contractor, CARRIER shall refund to CONTRACTOR a pro-rata share of the amount received by CARRIER.  CONTRACTOR shall not be entitled to reimbursement for any unused portion of an IRP plate, however, unless CARRIER is able to reuse or resale the plate to another contractor.

**(f)** **Fuel Taxes**.  For the purposes of computing and paying all state fuel taxes owed for the Equipment, CARRIER shall issue CONTRACTOR a fuel card to be used for all fuel purchases. All fuel charges and state fuel taxes will be charged back to CONTRACTOR as allowed for under this Agreement along with a monthly fee of $40 for each vehicle contracted to CARRIER.  In the event CONTRACTOR or its drivers fail to use CARRIER's fuel card, CONTRACTOR shall be responsible for providing CARRIER with an accurate accounting of all fuel purchases and miles traveled for the purposes of computing state fuel tax liability, and CONTRACTOR shall provide CARRIER with all original fuel receipts.

**10.**    **CARGO CLAIMS**.    CONTRACTOR shall immediately report all cargo claims, including all shortages, overages or other exceptions to the cargo, to CARRIER.  CONTRACTOR shall be liable for, and CARRIER shall charge back to CONTRACTOR, the first $1,500 of each cargo claim, including but not limited to, delay, shortages, misdelivery, and any direct damage claim relating to lost, damaged or contaminated loads, arising out of, or in connection with CONTRACTOR's services.  The dollar limit in this paragraph shall not apply to damages arising out of or in connection with such claims if involving CONTRACTOR's (including CONTRACTOR's agents' or employees') gross negligence, willful misconduct, breach of this Agreement, or other culpable acts or omissions.  Before deducting any cargo claim from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization for each such claim.

**11.**    **USE OF CARRIER'S TRAILER.**  CONTRACTOR agrees to return any trailer, trailer equipment of any kind or purpose, or chassis provided for its use by CARRIER in the same good condition as received by CONTRACTOR, reasonable wear and tear excepted, along with any and all other equipment and property belonging to CARRIER immediately upon CARRIER's request or upon termination of this Agreement.  In the event the trailer is not in as good as condition as it was delivered by CARRIER, CONTRACTOR hereby authorizes CARRIER to restore the trailer to proper condition and to charge back to CONTRACTOR the costs of such repairs or reconditioning.  In the event CONTRACTOR for any reason fails to comply with this provision and return CARRIER's trailer, CONTRACTOR agrees to reimburse CARRIER for all reasonable expense and costs, including attorney fees, incurred by CARRIER in recovery of its trailer or property from CONTRACTOR or its drivers.  CONTRACTOR agrees that in the event it is necessary for CARRIER to enter upon private property or remove private property in order to recover its trailer and property, CONTRACTOR does hereby irrevocably grant CARRIER or its duly authorized agents, permission to do so and further agrees to indemnify and hold harmless CARRIER, and its duly authorized agents, from any form of liability whatsoever in connection with such repossession. CONTRACTOR shall be liable for, and pay, the entire amount for each incident involving direct, indirect and consequential damage, including but not limited to, towing charges, replacement costs for a total loss, arising out of, or in connection with, CONTRACTOR's use of CARRIER's trailers, CARRIER's customer's trailers, other CARRIER equipment, or equipment of any other carrier. Before deducting any such damage from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization of such damage.  CONTRACTOR agrees and warrants that any trailer provided for use by CARRIER will only be used by CONTRACTOR and its drivers to transport shipments tendered to CONTRACTOR by CARRIER.

**12.** **ACCIDENTS AND CLAIMS.** CONTRACTOR shall immediately report any accident or potential claim to CARRIER involving operations under this Agreement. CONTRACTOR shall be liable for, and CARRIER shall charge back to CONTRACTOR, the first $2,500 of each accident claim, including but not limited to, property damage, personal injury (including death), investigation and clean-up expenses, and towing/recovery costs, arising out of, or in connection with CONTRACTOR's services. The dollar limit in this paragraph shall not apply to damages arising out of or in connection with such claims if involving CONTRACTOR's (including CONTRACTOR's agents' or employees') gross negligence, willful misconduct, breach of this Agreement, or other culpable acts or omissions. Before deducting any accident claim from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization for each such claim. CONTRACTOR and its drivers shall cooperate fully with CARRIER with respect to any legal action, regulatory hearing or other similar proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder. CONTRACTOR shall, upon CARRIER's request and at CONTRACTOR's sole expense, provide written reports or affidavits, attend hearings and trials and assist in securing evidence or obtaining the attendance of witnesses. CONTRACTOR shall provide CARRIER with any assistance as may be necessary for CARRIER or CARRIER's representatives or insurers to investigate, settle or litigate any accident, claim or potential claim by or against CARRIER.

**13.** **HOLD HARMLESS.** Except to the extent CONTRACTOR's acts or omissions are covered under the parties' respective insurance policies as set forth in Appendix B with no expense to CARRIER, CONTRACTOR agrees to defend, indemnify and hold harmless CARRIER from any direct, indirect and consequential loss, damage, fine, expense, including reasonable attorney's fees, action, claim for injury to persons, including death, and damage to property which CARRIER may incur arising out of or in connection with the operation of the Equipment, CONTRACTOR's obligations under this Agreement, or any breach by CONTRACTOR of the terms of this Agreement. This provision shall remain in full force and effect both during and after the termination of this Agreement.

**14.** **CARRIER RESPONSIBILITIES.**

**(a)** **Exclusive Possession and Responsibility.** The Equipment shall be for CARRIER's exclusive possession, control, and use for the duration of this Agreement. As such, CONTRACTOR shall not operate the Equipment for any other motor carrier or entity during the term of this Agreement without prior written consent from CARRIER. CARRIER shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement. This subparagraph is set forth solely to conform with DOT regulations and shall not be used for any other purposes, including any attempt to classify CONTRACTOR as an employee of CARRIER. Nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether CONTRACTOR or its drivers are an independent contractor or an employee of CARRIER. An independent contractor relationship may exist when a carrier complies with 49 U.S.C. § 14102 and attendant administrative requirements. Notwithstanding the above, Contractor is not prohibited from providing transportation services for other common or contract carriers or any other person or entity, provided that Contractor complies with the trip lease requirements set forth under federal law in 49 C.F.R. Part 376. CONTRACTOR may trip lease or subcontract the Equipment to a third party upon receiving prior authorization from CARRIER. CARRIER assumes no responsibility for the collection of freight charges or payment to CONTRACTOR for any trip-lease or subcontract related revenue. During the term of any trip lease or subcontract, CONTRACTOR will remove or cover up all of CARRIER's identification on the Equipment and display instead the trip-lease carrier's identification and, as between CONTRACTOR and CARRIER, CARRIER will have no responsibility for, and CONTRACTOR will fully indemnify CARRIER regarding, the operation of the Equipment.

**(b)** **Identification of Equipment.** CARRIER shall identify the Equipment in accordance with the requirements of the DOT and appropriate state regulatory agencies. CARRIER shall have the right to place and maintain on the Equipment CARRIER's name and any lettering, advertisement, slogans or designs as CARRIER may choose. CONTRACTOR shall remove such identification

FILED DATE: 10/5/2021 1:29 PM    2021L009787

at the termination of this Agreement or while operating such Equipment for any purpose other than conducting CARRIER's business. At its discretion, CONTRACTOR may have the identification permanently painted on the Equipment. CONTRACTOR further agrees to keep the Equipment in clean appearance and identified as described herein, at its sole cost and expense. CARRIER agrees that CONTRACTOR may display CONTRACTOR's name and address on the Equipment where required by applicable state law.

**15.** **CONTRACTOR NOT EMPLOYEE OF CARRIER.** It is expressly understood and agreed that CONTRACTOR is an independent contractor for the Equipment and driver services provided pursuant to this Agreement. CONTRACTOR agrees to defend, indemnify and hold CARRIER harmless for any claims, suits, or actions, including reasonable attorney's fees in protecting CARRIER's interests, brought by employees, any union, the public, or state or federal agencies, arising out of the operation of the Equipment or the providing of driver services under this Agreement. CONTRACTOR also agrees to provide necessary documentation and apply for certification of its independent contractor status where mandated by applicable state law, including but not limited to, the State of South Dakota. CONTRACTOR hereby assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, wages and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, workers' compensation, adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of CONTRACTOR's use or employment of drivers and laborers, and any and all other employees or agents of CONTRACTOR that CONTRACTOR may provide or use to perform any aspect of this Agreement. CONTRACTOR shall be solely responsible for complying with any and all state and federal laws, rules and regulations that may be applicable to the terms and conditions of employment of CONTRACTOR's employees or applicants for employment, including, without limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of highway use tax being currently paid when the CONTRACTOR purchases its license; proof of payment of income; unemployment; Medicare and other state and federal payroll taxes; and, other required withholdings for CONTRACTOR's employees. CONTRACTOR's performance of these responsibilities shall be considered proof of its status as an independent contractor in fact. Proof of such control and responsibility shall be submitted by CONTRACTOR to CARRIER as required by CARRIER and may include, but not be limited to, proof of highway use tax being currently paid, proof of income tax being currently paid, and proof of payment of payroll tax for CONTRACTOR's drivers. For the purposes of this section, the term CONTRACTOR refers to the owner of the Equipment as well as drivers that may be operating the Equipment on behalf of the owner. As required by law, CARRIER agrees to file information tax returns (Form 1099) on behalf of CONTRACTOR if CONTRACTOR is paid more than the statutory amount in compensation during a calendar year.

**16.** **BREACH.** Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated, at any time, by either party in the event of a party's actual or threatened commitment of a felony or intentional tort; violation of, or failure to comply fully with, the requirements of any applicable federal, state, local, and foreign authorities, including but not limited to DOT, state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"); material breach of this Agreement; or the occurrence of an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5, that, in CARRIER's reasonable judgment, was caused in whole or in part by CONTRACTOR's negligence, gross negligence, or willful misconduct, then the other party may elect to terminate the Agreement by giving immediate oral, followed by written, notice of termination to the offending party. If, in CARRIER's judgment, CONTRACTOR has subjected CARRIER to liability because of CONTRACTOR's acts or omissions, CARRIER may take possession of the shipment entrusted to CONTRACTOR and complete performance. In such event, CONTRACTOR shall waive any recourse against CARRIER for such action and CONTRACTOR shall reimburse CARRIER for all direct or indirect costs, expenses, or damages, including attorney's fees, incurred by CARRIER as a result of CARRIER's taking possession of the shipment and completing performance.

FILED DATE: 10/5/2021 1:29 PM    2021L009787

**17.**   **CONTRACTOR NOT REQUIRED TO PURCHASE PRODUCTS, EQUIPMENT, OR SERVICES FROM CARRIER.**   CONTRACTOR is not required to purchase or rent any products, equipment, or services from CARRIER as a condition of entering into this Agreement.   In the event CONTRACTOR elects to purchase or rent equipment from CARRIER or from any third party, for which the purchase or rental contract gives CARRIER the right to make deductions from CONTRACTOR's settlement, then the parties mutually agree to attach and incorporate each such contract, specifying all terms thereof, to this Agreement as a separate addendum.

**18.**   **PASSENGER AUTHORIZATION.**   As required by 49 C.F.R. § 392.60, CONTRACTOR shall not allow any passengers to ride in the Equipment unless authorized in writing by CARRIER as required by law.   Before passenger authorization will be given by CARRIER, CONTRACTOR (or its driver) and the passenger requesting authorization shall submit a fully executed Passenger Authorization and Release of Liability form to CARRIER for prior approval.

**19.**   **LOADING AND UNLOADING.**   In the event the shipper or consignee does not assume loading and unloading responsibilities, CONTRACTOR shall be responsible for the loading or unloading of property transported on behalf of CARRIER at CONTRACTOR's expense.

**20.**   **CONFIDENTIALITY AND NON-SOLICITATION.**   CONTRACTOR hereby recognizes and acknowledges that any list of CARRIER's customers, as it may exist now or from time to time, is a valuable, special and unique asset of the business of CARRIER.   CONTRACTOR agrees, during and after the term of this Agreement, not to disclose the list of CARRIER's customers or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever without CARRIER's prior written consent.   CONTRACTOR agrees to preserve as "Confidential Matters", all trade secrets, know how and information relating to CARRIER's business, forms, processes, developments, sales and promotional systems, prices and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, or other contractors, and other sources of any kind resulting from this Agreement.   CONTRACTOR agrees to regard such Confidential Matters as the sole property of CARRIER, and shall not publish, disclose or disseminate the same to others without the written consent of CARRIER.   In the event of any breach or threatened breach by CONTRACTOR of the provisions of this paragraph, CARRIER shall be entitled to an injunction, restraining CONTRACTOR from disclosing, in whole or in part, the list of CARRIER's customers, and all other Confidential Matters.   CONTRACTOR agrees that CARRIER will be irreparably damaged in the event of any breach of this provision by CONTRACTOR.   Accordingly, in addition to any other legal or equitable remedies that may be available to CARRIER, CONTRACTOR agrees that CARRIER will be able to seek and obtain immediate injunctive relief in the form of a temporary restraining order without notice, preliminary injunction, or permanent injunction against CONTRACTOR to enforce this confidentiality provision.   CARRIER shall not be required to post any bond or other security and shall not be required to demonstrate any actual injury or damage to obtain injunctive relief from the courts. Nothing hereunder shall be construed as prohibiting CARRIER from pursuing any remedies available to CARRIER at law or in equity for such breach, including the recovery of monetary damages from CONTRACTOR. CARRIER will not solicit traffic from any shipper, consigner, consignee or customer of CARRIER where (1) the availability of such traffic first became known to CARRIER as a result of CARRIER efforts, or (2) the traffic of the shipper, consigner, consignee or customer of CARRIER was first tendered to the CARRIER by CARRIER.   If CARRIER breaches this contract and directly or indirectly delivers or solicits traffic from customers of ISP and obtains traffic from such customers during the term of this contract of twenty-four (24) months thereafter, as a result of adverse routing impact arising from loss of business by virtue of violation of this provision, CARRIER shall be obligated to pay CARRIER, for a period of fifteen (15) months thereafter, as liquidated damages and not as a penalty, the amount equal to seventy-five percent (75%) of the transportation revenue resulting from traffic transported for such customers, and CARRIER will provide CARRIER with all documentation requested by CARRIER to verify such transportation revenue.

**21.**   **BENEFIT AND ASSIGNMENT.**   This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors.   CONTRACTOR may not assign or

FILED DATE: 10/5/2021 1:29 PM    2021L009787

subcontract all or a portion of its obligations to another party without the prior written consent of CARRIER.

**22.    NOTICE.**  All notices required or permitted by this Agreement shall be in writing delivered personally, by postage prepaid, first class mail, by facsimile machine to the addresses or fax number shown at the end of this Agreement, or by appropriate electronic means as outlined in Appendix D.

**23.    NON-WAIVER.**  The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement, or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a customary practice contrary to such provision or right.

**24.    SEVERABILITY.**  If any Agreement or its appendices is deemed invalid for any reason whatsoever, the Agreement shall be void only as to such provision, and this Agreement shall remain otherwise binding between the parties.  Any provision voided by operation of the foregoing shall be replaced with provisions which shall be as close as the parties' original intent as permitted under applicable law.

**25.    GOVERNING LAW AND CHOICE OF FORUM.**  This Agreement is to be governed by the laws of the United States and of the State of Texas, without regard to the choice-of-law rules of Texas or any other jurisdiction.  The parties further agree that any claim or dispute arising from or in connection with this Agreement or otherwise with respect to the overall relationship between the parties, whether under federal, state, local, or foreign law, shall be brought exclusively in state or federal courts closest to CARRIER's corporate office in Roanoke, Texas.

**26.    COMPLETE AGREEMENT.**  The Agreement (including the Appendices and any addendums) constitute the entire agreement between CARRIER and CONTRACTOR pertaining to the subject matter contained herein and fully replaces and supersedes all prior and contemporaneous agreements, representations, and understandings.  No supplement, modification, or amendment to the Agreement shall be binding unless in writing and signed by both CARRIER and CONTRACTOR, except as otherwise provided with respect to deductions in Appendix A and insurance deductions in Appendix B.  No waiver of any of the provisions of the Agreement shall constitute a waiver of any other provisions whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be deemed effective or binding upon the CONTRACTOR unless executed in writing by the party making the waiver.

        **IN WITNESS WHEREOF,** CARRIER and CONTRACTOR hereby sign this Agreement as of the date stated above.

Interstate Service (Provider Name) **(Carrier Name)**
 2509100      **(Carrier US DOT #)**                    :

1600 Wayne Lanter Rear
Madison, Illinois 62060
Phone:  (618) 219-3951
Fax:    (618) 260-226-3563

By:_____

Kimberly Theobald_____
Printed Name

Check one:
☐         Corporation
☐         Limited Liability Company
☐         Partnership
X         Sole Proprietorship

Organized in State of:  IL
With Employer ID No.: ███████
OR Social Security No. (last 4 digits only)

**CONTRACTOR:**  Marcellus Warren

Fax:██████████
 Decatur, IL 62523
Address

9

FILED DATE: 10/5/2021 1:29 PM   2021L009787

Phone: ███████████

Cell Phone: ███████████

E-Mail Address: ████████████████████

By:_____

 Marcellus Warren_____
Printed Name

10

FILED DATE: 10/5/2021 1:29 PM  2021L009787

**RECEIPT FOR POSSESSION OF CONTRACTED VEHICLE(S)**

Received from CONTRACTOR the vehicle or vehicles described in this Agreement.

Equipment received at _____ on _____, 20_____
at _____:_____ o'clock _____.M.


By:_____
    (CARRIER Representative)


_____
Printed Name

---

**RECEIPT FOR RETURN OF CONTRACTED VEHICLE(S)**

Received from CARRIER the vehicle or vehicles described in this Agreement in good order.

Equipment received at _____ on _____, 20_____
at _____:_____ o'clock _____.M.


By:_____
    (CONTRACTOR Representative)


_____
Printed Name

**RECEIPTS**

FILED DATE: 10/5/2021 1:29 PM   2021L009787

**Appendix A**

**CONTRACTOR's Compensation**

1.    **COMPENSATION.** Unless otherwise agreed to in writing between the parties, CARRIER shall pay CONTRACTOR based on the following amounts:

$ 371.98  per day (for each day worked)

2.    **CHARGE BACK ITEMS.** The following items shall be charged back and deducted from CONTRACTOR's compensation or from CONTRACTOR's escrow funds in the event that CONTRACTOR's compensation is insufficient:

| CHARGE BACK ITEM | COST | ADMINISTRATIVE CHARGE |
|---|---|---|
| Accident Claim | Actual up to $2,500 per claim | None |
| Advances in Compensation | Actual | None |
| Fuel and Fuel Taxes | Actual | None |
| Other Operating Expenses (See Section 9) | Actual | None |
| IRP Plate | Actual | None |
| Cargo Claim | Actual up to $1,500 per claim | None |
| C.O.D. Charges | Actual | None |
| Fines and Penalties | Actual | None |
| Trailer Damage | Actual | None |
| Insurance Costs | See Appendix B | See Appendix B |

   CONTRACTOR agrees that CARRIER may charge back to CONTRACTOR any other expenses or cost incurred by CARRIER for which CONTRACTOR is responsible for under this Agreement or as otherwise agreed to by the parties. CONTRACTOR hereby waives any objection to any charge back item unless CONTRACTOR notifies CARRIER of CONTRACTOR's disagreement with such charge back within thirty (30) days of the charge back.

3.    **CHANGES IN EXISTING DEDUCTION ITEMS.** If an item in any of the above columns will be changing, CONTRACTOR shall be so notified by personal delivery, fax, or other written notice. In any event, CONTRACTOR shall not be subject to any such change until ten (10) calendar days after such notice or such later time as is set forth in the notice. **CONTRACTOR's failure, by the end of ten calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the deductions from CONTRACTOR's Settlement Compensation, beginning immediately after the ten-day period.** Such modified amounts shall replace and supersede those shown in the table in Section 2 above. If CONTRACTOR fails to notify CARRIER of CONTRACTOR's objection within the ten-day period – or if CONTRACTOR notifies CARRIER of CONTRACTOR's objection within the ten-day period and the parties are then unable to resolve the matter, the parties shall each have the right to terminate the Agreement immediately thereafter. Once the change becomes effective, CONTRACTOR still retains the right to terminate the Agreement in accordance with the procedures set forth in Section 2 of the Agreement (although CONTRACTOR shall remain subject to the change until the effective date and time of CONTRACTOR's termination).

FILED DATE: 10/5/2021 1:29 PM   2021L009787

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**                                              **CONTRACTOR:**

By: _____          By: _____

Kimberly Theobald                                        Marcellus Warren
Printed Name                                                Printed Name

Dated: _____05-21-2020_____          Dated: _____05-21-2020_____

---

**APPENDIX A**

FILED DATE: 10/5/2021 1:29 PM   2021L009787

## Appendix B

### INSURANCE AND ALLOCATION OF LIABILITY

1. **CARRIER'S INSURANCE OBLIGATIONS.** It shall be CARRIER's responsibility, pursuant to DOT regulations promulgated under 49 U.S.C. § 13906 and pursuant to applicable state laws, to provide public liability, property damage, and cargo liability insurance for the Equipment at all times while the Equipment is being operated on behalf of CARRIER. However, CARRIER's possession of such insurance shall in no way affect CARRIER's rights of indemnification against CONTRACTOR as provided for in this Agreement.

2. **CONTRACTOR'S INSURANCE OBLIGATIONS.** CONTRACTOR shall maintain, at its sole cost and expense, the following minimum insurance coverages during this Agreement:

**(a)** **NON-TRUCKING LIABILITY** - CONTRACTOR shall procure, carry, and maintain public liability and property damage insurance which shall provide coverage to CONTRACTOR whenever the Equipment (as well as any CARRIER trailer) is not being operated on behalf of CARRIER (including, but not limited to, whenever the Equipment is being operated on behalf of others pursuant to a Trip Lease or whenever the Equipment is being operated on behalf of CONTRACTOR alone) in a combined single limit of not less than One Million Dollars ($1,000,000) for injury or death to any person or for damages to property in any one occurrence. Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix. In addition, such coverage shall be primary to any other insurance that may be available from CARRIER. CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

**(b)** **WORKERS' COMPENSATION/OCCUPATIONAL ACCIDENT INSURANCE**. CONTRACTOR shall provide workers' compensation insurance coverage for CONTRACTOR (if a natural person), all of its employees and agents, anyone driving the Equipment, or serving as a driver's helper, and any other persons required to be covered under the workers' compensation law of any state that is reasonably likely to have jurisdiction over CONTRACTOR's business operations and in amounts not less than the statutory limits required by such applicable state law. The worker's compensation insurance policy shall provide principal coverage in the CONTRACTOR's state of domicile and the state in which the work is principally localized if different, and shall provide "other states coverage" that excludes only North Dakota, Ohio, Washington, and Wyoming. As evidence of such coverage, CONTRACTOR shall provide CARRIER with a copy of the insurance policy declarations page for CONTRACTOR's verification before operating the Equipment under this Agreement.

So long as the state in which the work is principally localized is not Massachusetts, Nevada, New Hampshire, New Jersey, or North Carolina, then CONTRACTOR's and their 1099 Independent Contractor Drivers and Helpers may, as an alternative to obtaining workers' compensation coverage, obtain an Occupational Accident insurance policy that includes either an endorsement or a separate policy provision whereby the insurer provides, or agrees to provide, workers' compensation coverage that becomes effective for a claim by CONTRACTOR, or CONTRACTOR 1099's, alleging employee status. Such Occupational Accident insurance coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Certificate of Insurance section of this Appendix (and shall include the following minimum terms: $1,000,000 minimum combined single limit; $500 minimum maximum weekly temporary total disability limit; $250,000 accidental death and disability limit; contingent liability coverage that will provide coverage equal to statutory

**APPENDIX B**

workers' compensation benefits in all states; with CARRIER named as an additional insured on the policy).

**(c)** **PASSENGER INSURANCE**.  CONTRACTOR shall procure, carry, and maintain passenger liability insurance that shall provide coverage to CONTRACTOR whenever the Equipment is being operated (whether or not on behalf of CARRIER) in a combined single limit of not less than _____ Dollars ($____,000) for injury or death to any person riding as a passenger in the Equipment or for damages to that person's property in any one occurrence.  Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix.  In addition, such coverage shall be primary to any other insurance that may be available from CARRIER.  CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

**(d)** **OTHER INSURANCE**.  In addition to the insurance coverages required under this Agreement, it is CONTRACTOR'S responsibility to procure, carry and maintain any fire, theft, uninsured and/or underinsured motorist, and physical damage (collision), or other insurance coverage that CONTRACTOR may desire for the Equipment or for CONTRACTOR's health care or other needs.   As provided in this Agreement, CONTRACTOR holds CARRIER harmless with respect to loss of or damage to CONTRACTOR's Equipment, trailer, or other property, and CARRIER has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to CONTRACTOR's Equipment, trailer, or other property.   CONTRACTOR acknowledges that CARRIER may, and CONTRACTOR hereby authorizes CARRIER to, waive and reject no-fault, uninsured, and underinsured motorist coverage from CARRIER's insurance policies to the extent allowed under Illinois or Texas law (or such other state law where the Equipment is principally garaged), and CONTRACTOR shall cooperate in the completion of all necessary documentation for such waiver, election, or rejection.

3.      **REQUIREMENTS APPLICABLE TO ALL OF CONTRACTOR'S INSURANCE COVERAGES.**     CONTRACTOR shall procure insurance policies providing the above-described coverages solely from insurance carriers that are A.M. Best "A"-rated, and CONTRACTOR shall not operate the Equipment under this Agreement unless and until CARRIER has determined that the policies are acceptable (CARRIER's approval shall not be unreasonably withheld).  CONTRACTOR shall furnish to CARRIER written certificates obtained from CONTRACTOR'S insurance carriers showing that all insurance coverages required above have been procured from A.M. Best "A" rated insurance carriers, that the coverages are being properly maintained, and that the premiums thereof are paid.   Each insurance certificate shall specify the name of the insurance carrier, the policy number, and the expiration date; list CARRIER as an additional insured with primary coverage; and show that written notice of cancellation or modification of the policy shall be given to CARRIER at least thirty (30) days prior to such cancellation or modification.

4.      **CONTRACTOR'S LIABILITY IF REQUIRED COVERAGES ARE NOT MAINTAINED.**  In addition to CONTRACTOR's hold harmless/indemnity obligations to CARRIER under the Agreement, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from any direct, indirect, or consequential loss, damage, fine, expense, including reasonable attorney fees, actions, claim for injury to persons, including death, and damage to property that CARRIER may incur arising out of or in connection with CONTRACTOR'S failure to maintain the insurance coverages required by this Agreement.   In addition, CONTRACTOR, on behalf of its insurer, expressly waives all subrogation rights against CARRIER, and, in the event of a subrogation action brought by CONTRACTOR's insurer, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from such claim.

5.      **AVAILABILITY OF INSURANCE FACILITATED BY CARRIER.**  CONTRACTOR may, if it so chooses by initialing one or more boxes in the right-hand column of the attached "CERTIFICATE OF INSURANCE," authorize CARRIER to facilitate, on CONTRACTOR'S behalf, the insurance coverages

**APPENDIX B**

FILED DATE: 10/5/2021 1:29 PM    2021L009787

FILED DATE: 10/5/2021 1:29 PM   2021L009787

required or made optional by this Agreement. In any such case, CARRIER shall deduct, from CONTRACTOR settlement compensation, amounts reflecting all of CARRIER's expense and cost in obtaining and administering such coverage. In addition, if CONTRACTOR fails to provide proper evidence of the purchase or maintenance of the insurance required above, then CARRIER is authorized but not required to obtain such insurance at CONTRACTOR's expense and deduct, from CONTRACTOR's settlement compensation, amounts reflecting all of CARRIER's expense in obtaining and administering such coverage. CONTRACTOR recognizes that CARRIER is not in the business of selling insurance, and any insurance coverage requested by CONTRACTOR from CARRIER is subject to all of the terms, conditions, and exclusions of the actual policy issued by the insurance underwriter. CARRIER shall ensure that CONTRACTOR is provided with a certificate of insurance (as required by 49 C.F.R. § 376.12(j)(2)) for each insurance policy under which the CONTRACTOR has authorized CARRIER to facilitate insurance coverage from the insurance underwriter (each such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to CONTRACTOR for each type of coverage, and the deductible amount for each type of coverage for which CONTRACTOR may be liable), and CARRIER shall provide CONTRACTOR with a copy of each policy upon request.

6.    **CHANGES IN COST OR OTHER DETAILS OF COVERAGES.** If CARRIER is facilitating any insurance coverages for CONTRACTOR pursuant to Section 5 of this Appendix and the cost to CONTRACTOR for, or other details of, a coverage changes from the information listed in the attached "CERTIFICATE OF INSURANCE", CONTRACTOR will be so notified by personal delivery, fax, or other written notice. In any event, CONTRACTOR shall not be subject to any such change until ten (10) calendar days after such notice or such later time as is set forth in the notice. **CONTRACTOR's failure, by the end of ten (10) calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the deductions from CONTRACTOR's settlement compensation, beginning immediately after the 10-day period. Such modified amounts shall replace and supersede those shown in the Certificate of Insurance and CARRIER shall not have an obligation to also provide a revised Certificate of Insurance.** If CONTRACTOR fails to notify CARRIER of any objection within the 10-day period -- or if CONTRACTOR notifies CARRIER of its objection within the 10-day period and CONTRACTOR and CARRIER are then unable to resolve the matter to their mutual satisfaction -- CONTRACTOR and CARRIER shall each have the right to terminate this Agreement effective immediately upon the change becoming effective (although CONTRACTOR shall remain subject to the change until CONTRACTOR's termination's effective date and time).

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**                                              **CONTRACTOR:**

By: _____      By: _____

   Kimberly Theobald                                   Marcellus Warren
Printed Name                                             Printed Name

Dated:   05-21-2020                             Dated:   05-21-2020

**APPENDIX B**

FILED DATE: 10/5/2021 1:29 PM 2021L009787

## CERTIFICATE OF INSURANCE

CONTRACTOR hereby requests CARRIER, through its insurer, to facilitate on CONTRACTOR's behalf (if they are available) the insurance coverages CONTRACTOR has selected by placing CONTRACTOR's initials in the right-hand column below:

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| 1. **Non-Trucking Liability Insurance:** <br><br> *Per coverage overview* | _X_ YES <br><br> ____ NO |
| 2. **Occupational Accident Insurance:** <br><br> *Per coverage overview* | X YES <br><br> NO |
| 3. **Physical Damage Insurance on Tractor:** <br><br> *Per coverage overview* | _X_ YES <br><br> NO |
| 4. **Deductible Buy-Back Insurance:** <br><br> *Per coverage overview* | ____ YES <br><br> X NO |
| 5. **Health Insurance** <br><br> *Per coverage overview* | ____ YES <br><br> X NO |
| 5. **Passenger Insurance** <br><br> *Per coverage overview* | ____ YES <br><br> X NO |

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**

By: _____ K J _____

Kimberly Theobald
Printed Name

Dated: ___05-21-2020_____

**CONTRACTOR:**

By: _____ Wa _____

Marcellus Warren
Printed Name

Dated: ___05-21-2020_____

**APPENDIX B**

FILED DATE: 10/5/2021 1:29 PM   2021L009787

**APPENDIX B**

FILED DATE: 10/5/2021 1:29 PM   2021L009787

## Appendix C

### ESCROW

As authorized by Paragraph 7 of this Agreement, CARRIER shall establish and administer an Escrow Fund, which CONTRACTOR and CARRIER agree shall be governed by the following terms and conditions:

1.    **PRINCIPAL.**  The amount of principal to be held in the Escrow Fund shall be a minimum of $\_\_0\_\_, which amount is to be deducted from CONTRACTOR's compensation at $\_\_0\_\_ per mile every week beginning the first week of services provided by CONTRACTOR under the Agreement.  If, at any time, the principal amount in escrow falls below $\_\_\_0\_\_, CONTRACTOR authorizes CARRIER to deduct from CONTRACTOR's compensation a maximum amount of $\_\_0\_\_ per week until the full principal amount is replenished.

2.    **SPECIFIC ITEMS TO WHICH ESCROW FUND MAY BE APPLIED.**  The Escrow Fund shall be held by CARRIER for the purpose of insuring compliance with the provisions of the Agreement. The specific items to which the Escrow Fund shall apply are all advances, expenses, taxes, fees, fines, penalties, damages, losses, or other amounts paid, owed, or incurred by CARRIER, or owed by CONTRACTOR to a third party under a purchase or rental contract, that are CONTRACTOR's responsibility under the Agreement-- specifically, the charge-back and deduction items set forth in Appendix A and other appendices (hereafter "Escrow Items") -- to the extent that the amounts owed by CONTRACTOR for such Escrow Items exceed CONTRACTOR's earned and payable compensation at the time of any settlement or final accounting.

3.    **ACCOUNTINGS.**  While the Escrow Fund is under CARRIER's control, CARRIER shall provide an accounting to CONTRACTOR, no less frequently than monthly, of all transactions involving such funds by clearly indicating on individual settlement sheets the amount and description of any deduction or addition made to the Escrow Fund.  In addition, upon CONTRACTOR's request, CARRIER shall provide CONTRACTOR with an accounting of any transactions involving CONTRACTOR's Escrow Fund.

4.    **INTEREST.**  CARRIER shall pay interest to CONTRACTOR on the Escrow Fund on at least a quarterly basis ("interest period") beginning with receipt of the first CONTRACTOR contribution of principal.  The interest rate shall be established on the date the interest period begins and shall be equal to the average yield of 91-day, 13-week U.S. Treasury bills, as established in the weekly auction by the Department of Treasury.  For purposes of calculating the balance of the Escrow Fund on which interest is paid, CARRIER may deduct a sum equal to the average advance (including all charge-backs and other deductions) made to CONTRACTOR during the period of time for which interest is paid.

5.    **FINAL SETTLEMENT.**  To have any remaining balance in the Escrow Fund returned following termination of the Agreement, CONTRACTOR must first comply with all of the specific obligations set forth in the Agreement, and make payments to CARRIER for all Escrow Items.  At the time of the return of any remaining balance in the Escrow Fund, CARRIER may deduct monies for all Escrow Items.  Such deductions shall be limited to amounts CARRIER actually spends, incurs, or owes to a third party, or that CONTRACTOR owes to CARRIER or a third party under a purchase or rental contract, before termination of this Agreement or, with respect to any CONTRACTOR obligation triggered by termination, including any expenses (including reasonable attorneys' fees) incurred by CARRIER in seeking the return of its identification devices and other property, all amounts CARRIER actually spends, incurs, or owes to a third party upon termination or within forty-five (45) days thereafter. CARRIER shall not make deductions from the Escrow Fund for items for which, by the end of forty-five (45) days after termination, neither CONTRACTOR nor CARRIER has yet made an expenditure or incurred a quantified, legally binding obligation to pay.  CARRIER shall provide a final accounting to CONTRACTOR of all such final deductions made from the Escrow Fund within forty-five (45) days from the date of termination of the Agreement.

---

**APPENDIX C**

FILED DATE: 10/5/2021 1:29 PM   2021L009787

6. **RETURN OF ESCROW BALANCE.**  In no event shall the Escrow Fund, less any final deductions pursuant to the above provision, be returned to CONTRACTOR later than forty-five (45) days from the date of termination of this Agreement.   CARRIER's use, or post-termination return to CONTRACTOR, of any balance in the Escrow Fund shall not constitute a waiver of CARRIER's right to recover, through arbitration or other available legal means, any additional amounts CONTRACTOR owes, or comes to owe, CARRIER under this Agreement.

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**                                          **CONTRACTOR:**


By: _____          By: _____

Kimberly Theobald                                      Marcellus Warren
Printed Name                                              Printed Name

Dated: _05-21-2020_____          Dated: __05-21-2020_____

**APPENDIX C**

FILED DATE: 10/5/2021 1:29 PM   2021L009787

**Appendix D**

## DEDUCTION FOR SUBLEASE OF EQUIPMENT

CONTRACTOR hereby authorizes and directs CARRIER to deduct from CONTRACTOR's compensation and to remit directly to Logistics Resource Solutions, Inc. ("Supplier"), the amount of $ __370__ per __week__, beginning on __05__ __21__, 20__20__, together with all other amounts due and owing Supplier, pursuant to the terms and conditions of the attached Sublease Agreement entered into by CONTRACTOR and Supplier on __05__ __21__, 20__20__ This Appendix E is being executed by CONTRACTOR and CARRIER to comply with the requirements of 49 C.F.R. § 376.12(i), and constitutes an addendum to the INDEPENDENT CONTRACTOR OPERATING AGREEMENT entered into by CONTRACTOR and CARRIER.

**THIS APPENDIX D is agreed to by the undersigned parties as of the latest date set forth below.**

**CARRIER**

By: _____
                    Signature

 Kimberly Theobald
                 Printed Name

05-21-2020
                    Date

**CONTRACTOR**

By: _____
                    Signature

 Marcellus Warren
                 Printed Name

05-21-2020
                    Date

**APPENDIX D**

FILED DATE: 10/5/2021 1:29 PM   2021L009787

**Appendix E**

## CONSENT TO CONDUCT BUSINESS USING ELECTRONIC METHODS

Pursuant to Regulatory Guidance Concerning Electronic Signatures and Documents, 74 Fed. Reg. 411 (Jan. 4, 2011), issued by the Federal Motor Carrier Safety Administration ("FMCSA"), Interstate Service Provider ("Carrier") and the contractor who completes the signature block below ("Contractor") hereby consent and agree to conduct business using electronic means. This consent encompasses the use of electronic methods to effect the signature of any document required by FMCSA regulations to be generated and maintained (or exchanged by private parties), including, without limitation, applications, driver histories and other qualification records, leases formed under 49 C.F.R. Part 376, driver-vehicle inspection reports, and records of duty status. Contractor agrees that the above electronic method, which Carrier has adopted to effect electronic signatures: (1) identifies and authenticates Contractor as the source of the electronic communication; (2) indicates Contractor's approval of the information contained in the electronic communication; and (3) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature. Either party may elect, with respect to any document, to use a manual/hardcopy signature, provided that such election shall not preclude the other party from applying an electronic signature to the same document.

**Contractor:** Marcellus Warren
Name (Typed or Printed)

_____tor: ▮

_____
Social Security No.

**If Corp., Prtnrship, or LLC:**

_____
Fed. Taxpayer ID No.

By: _____
Signature

Authorized Representative's Name (Typed or Printed)
Driver

_____
Title

▮

Address (Street, P.O. Box)
Decatur, IL 62523

City, State & Zip Code

▮

Telephone Number    Fax Number

Email Address

**Carrier:**

By: _____
Signature
Recruiter

Title
1600 Wayne Lanter Ave

Address (Street, P.O. Box)
Madison IL 62060

City, State & Zip Code
260-226-3563      260-226-3563

Telephone Number    Fax Number
k.theobald@isplogistics.com

Email Address

**APPENDIX E**

## INDEPENDENT CONTRACTOR AGREEMENT

Independent Service Provider, LLC ("CARRIER"), an authorized motor carrier, and _VAN L WELLS_ ("CONTRACTOR"), in consideration of the covenants and agreements contained herein and pursuant to the federal leasing regulations under 49 C.F.R. Part 376, enter into this Independent Contractor Agreement ("Agreement") on _02 - 06_, 20 _19_.

**I.     PROVISION OF SERVICES AND EQUIPMENT.**   During the term of this Agreement, CONTRACTOR shall provide CARRIER professional truck driving services, other incidental transportation related services, and the use of the equipment set forth below or in an appendix (the "Equipment"). CONTRACTOR represents and warrants that CONTRACTOR has title to or is authorized to contract the Equipment and services to CARRIER.  Upon taking possession of the Equipment from CONTRACTOR, CARRIER shall furnish to CONTRACTOR a receipt for Equipment, which shall constitute the receipt required by 49 C.F.R. § 376.11(b).  Upon termination of this Agreement, CONTRACTOR shall execute a similar receipt for equipment as the written receipt for the return of the Equipment by CARRIER to CONTRACTOR; provided, however, that the Agreement and CARRIER's obligations thereunder shall expire upon the written notice of termination regardless of whether CONTRACTOR submits the receipt required under this provision.

| Year | Make | Serial No. | Unit # |
|------|------|-----------|--------|
| 2020 | FRTL | TBD | 266376 |
|  |  |  |  |

**2.     DURATION OF AGREEMENT AND TERMINATION.** This Agreement shall begin on the date set forth above and end exactly one (1) year thereafter.  Either party may terminate this Agreement for any reason by giving ten (10) business days (excluding weekends and federal holidays) written notice to that effect to the other party either personally, by mail, by fax machine at the address or fax number shown at the end of this Agreement.  CARRIER may terminate this Agreement without the full ten (10) business days prior written notice if CONTRACTOR abandons its responsibility for providing services under this Agreement or if the customers serviced by CONTRACTOR voices complaints about the failure of CONTRACTOR or its employees to meet customer requirements, or if CARRIER loses any such customer on the account of CONTRACTOR.  In the event CARRIER is required to terminate the Agreement under this provision, CONTRACTOR shall be liable for payment equal to the average daily compensation set forth in Section 3 below multiplied by the number of days short of ten (10) days for which the wrongdoing CONTRACTOR failed to give notice of ceasing its responsibility.  CARRIER may deduct any such sum from any final amounts owed to CONTRACTOR under this Agreement.  The ability of either party to terminate this Agreement shall in no way be interpreted as an at-will employment provision and shall not otherwise affect CONTRACTOR's status as an independent contractor under this Agreement.  The effective date and time of termination shall be as set forth in the written notice or the receipt for Equipment issued by CONTRACTOR, whichever date is earlier.  CONTRACTOR shall, upon the termination of this Agreement, remove all CARRIER identification from the Equipment and return it to CARRIER, via hand delivery or certified mail, together with all of CARRIER's property, including trailers, paperwork, load securement equipment and freight, to CARRIER's nearest terminal.  If CONTRACTOR fails to return CARRIER's property or freight to CARRIER or remove and return all CARRIER identification from the Equipment upon termination of this Agreement, CONTRACTOR shall pay CARRIER, all collections costs incurred by CARRIER, including reasonable attorney fees, and CARRIER may pursue all other remedies allowed by law or authorized in the Agreement against CONTRACTOR.

**3.     COMPENSATION.** It is expressly understood and agreed that CONTRACTOR's compensation shall be as set forth in Appendix A, and such compensation shall constitute the total compensation for everything furnished, provided, or done by CONTRACTOR in connection with this Agreement, including driver's services.  All mileage computations shall be based on the most recent edition of CARRIER's Mileage Guide. Although CARRIER shall use reasonable efforts to make shipments available to

FILED DATE: 10/5/2021 1:29 PM   2021L009787

1

FILED DATE: 10/5/2021 1:29 PM   2021L009787

CONTRACTOR for transportation during the term of this Agreement, CONTRACTOR acknowledges and agrees that CARRIER does not guarantee any specific number of shipments or amount of revenue to CONTRACTOR during the term of this Agreement. CONTRACTOR may refuse any specific shipment offered by CARRIER. CONTRACTOR is not prohibited from entering into separate agreements to provide equipment and other professional truck drivers not identified as Equipment above or in an attachment and drivers not used to service this Agreement, to other motor carriers.

4.    **SETTLEMENT PERIOD.**  CARRIER shall settle with CONTRACTOR with respect to services provided under this Agreement within 15 calendar days after CONTRACTOR's submission, in proper form, of those documents necessary for CARRIER to secure payment from its customers, including the signed freight bill, delivery receipt or bill of lading, and properly completed logs as required by the U.S. Department of Transportation ("DOT"). Where CONTRACTOR is paid a percentage of revenue, CARRIER will provide CONTRACTOR with a copy of the rated freight bill (or a computed-generated summary) before or at the time of settlement. CONTRACTOR may examine CARRIER's tariffs, or other contracts or documents, if any, from which charges and rates are computed; provided, however, only that information that would appear on a rated freight bill will be disclosed by CARRIER. CARRIER shall have the right, but not as a condition of settlement and payment, to review all of CONTRACTOR's documents and records relating to the use of the Equipment and the services provided under this Agreement and CONTRACTOR agrees to provide CARRIER with access to such documents and records upon reasonable notice. With respect to final settlement upon termination of this Agreement, the failure on the part of CONTRACTOR to remove and return to CARRIER all identification devices of CARRIER or a letter certifying their removal shall entitle CARRIER to withhold any payments owed to CONTRACTOR until such obligation is met.

5.    **CHARGE BACK.**  CARRIER shall deduct from CONTRACTOR's compensation, at the time of payment to or settlement with CONTRACTOR, any liability or expense CARRIER has incurred or paid that, under this Agreement or any addendum to this Agreement, CONTRACTOR is obligated to bear. Such expenses shall be deducted from the amount of CONTRACTOR's settlement compensation and shall include those expenses set forth in Appendix A of this Agreement. The amount of each item to be charged back to CONTRACTOR shall be computed based on the actual cost or expense incurred by CARRIER and any administrative fee or mark-up disclosed in Appendix A or elsewhere in this Agreement or any addendum thereto. CARRIER shall provide CONTRACTOR written itemization and documentation of all charge backs where such documentation is necessary to verify the validity of the charge.

6.    **INSURANCE.**  The respective obligations of the parties shall be as set forth in Appendix B. CARRIER shall maintain public liability, property damage and cargo insurance in such amounts as are required by the DOT and applicable state regulatory agencies. CARRIER shall maintain insurance coverage for the protection of the public pursuant to 49 U.S.C. § 13906. CARRIER's possession of legally required insurance shall in no way restrict CARRIER's right of indemnification from CONTRACTOR as provided under this Agreement. It shall be considered a material breach of this Agreement where CONTRACTOR is determined by CARRIER or CARRIER's insurer to be uninsurable for any reason.

7.    **ESCROW FUND.**    CONTRACTOR authorizes CARRIER to establish and administer an escrow fund in accordance with the provisions of Appendix C.

FILED DATE: 10/5/2021 1:29 PM   2021L009787

8.     **COMPLIANCE WITH PERTINENT LAWS AND REGULATIONS BY CONTRACTOR.**
CONTRACTOR recognizes that CARRIER's separate and distinct business of providing motor carrier freight transportation service to the public is subject to regulation by the federal government acting through the DOT, and by various other federal, state, local, and foreign governing bodies. As such, CONTRACTOR hereby acknowledges that he/she possesses full and complete understanding and knowledge of the DOT's CSA program (including, but not necessarily limited to, driver violations and ranking criteria).  CONTRACTOR shall adhere to the following provisions of this Agreement to aid CARRIER in discharging its legal duties:

(a)     **Drivers.**  CONTRACTOR shall provide competent professional drivers who meet CARRIER's minimum driver qualification standards and all of the requirements of the DOT, including but not limited to, familiarity and compliance with state and federal motor carrier safety laws and regulations. The parties agree that CARRIER shall have the right to disqualify any driver provided by CONTRACTOR in the event that the driver is found to be unsafe, unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law or the criteria established by the DOT's Compliance, Safety & Accountability ("CSA") program, in violation of CARRIER's minimum qualification standards, or in violation of any policies of CARRIER's customers. Drivers with a recent history of accidents, traffic convictions and/or serious traffic offenses will not meet CARRIER's minimum qualification standards.  Upon a driver's disqualification by CARRIER, CONTRACTOR shall be obligated to furnish another competent, reliable and qualified professional driver that meets the minimum qualification standards established by CARRIER. For all qualified drivers, CONTRACTOR agrees to provide CARRIER with updated DSMS and DIRS driver rankings on a monthly basis.

(b)     **Paperwork Requirements.**  CONTRACTOR shall submit to CARRIER, on a timely basis, all driver logs and supporting documents (including original toll receipts for CARRIER's reproduction), physical examination certificates, accident reports, and any other required data, documents or reports, including any documentary evidence that CARRIER requests proving CONTRACTOR has paid all taxes legally due and owing to any government body. As required by 49 C.F.R. § 376.12(l), CARRIER will keep the original of this Agreement with a copy to be maintained by CONTRACTOR, and a second copy to be carried in the Equipment during the term of this Agreement.

(c)     **Shipping Documents.**  CONTRACTOR agrees that all bills of lading, waybills, freight bills, manifests, or other papers identifying the property carried on the Equipment shall be those of CARRIER, or as authorized by CARRIER, and shall indicate that the property transported is under the responsibility of CARRIER or a carrier with which the Equipment has been subcontracted.

(d)     **Drug and Alcohol Testing.**  CONTRACTOR and its drivers shall, as required by 49 C.F.R. § 382.103, comply with CARRIER's Drug and Alcohol Policy, including participation in CARRIER's random drug and alcohol testing program, and any addendums or revisions thereto.

(e)     **Safe Operations.**  CONTRACTOR agrees to operate the Equipment in a safe and prudent manner at all times so as to avoid endangering the public, the driver, and/or the property being transported and in accordance with this Agreement, the laws of the various jurisdictions in which the Equipment will be operated and pursuant to the operating authorities of CARRIER, and in accordance with all rules related to traffic safety, highway protection and road requirements. Moreover, CONTRACTOR agrees that all drivers and/or workers employed by CONTRACTOR will comply with the terms of this Agreement, including the requirement of safe operations, while operating the Equipment on behalf of CONTRACTOR.  CONTRACTOR agrees that any driver utilized by CONTRACTOR will comply with CARRIER's policies and procedures and any subsequent revisions thereto, which will be provided by CARRIER.